**UNITED STATES of America ex rel. Roland A. LeBLANC, Plaintiff,**

v.

**RAYTHEON COMPANY, Defendant.**

**Civ. A. No. 92–12528–RCL.**

United States District Court, D. Massachusetts.

Jan. 25, 1995.

Peter W. Adler, Natick, MA, for John Doe, Therese M. LeBlanc.

Robert D. City, Philip di Domenico, City, Hayes, Meagher & Dissette, PC, Boston, MA, Peter W. Adler, Natick, MA, for Roland A. LeBlanc.

Steven A. Kaufman, Martin J. Newhouse, David R. Baron, Ropes & Gray, Boston, MA, for Raytheon Co.

## OPINION

LINDSAY, District Judge.

Ever since the Persian Gulf War in 1991, a debate has raged about the effectiveness of defensive weaponry known as the Patriot Air Defense Missile System ("the Patriot"). Critics have asserted that numerous defects in the Patriot led to a dismal performance by the weapon during the Persian Gulf War. These critics claim, in addition, that, notwithstanding the Patriot's poor performance, the United States Army and the Patriot's manufacturer, Raytheon Company ("Raytheon"), have made unfounded and exaggerated claims about the success of the Patriot in intercepting and destroying Iraqi Scud missiles during the war.

Into this fray now comes the relator Roland LeBlanc.[1] He has sued Raytheon under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730, claiming that Raytheon made false and fraudulent claims to the government concerning the Patriot before, during and after the Persian Gulf War. Raytheon has filed a suggestion of lack of subject matter jurisdiction and a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Pointing to the public debate about the effectiveness of the Patriot, Raytheon claims that the "public disclosure bar" of the False Claims Act strips this Court of jurisdiction to hear LeBlanc's claims.

---

**1.** LeBlanc's teenage daughter, Theresa M. LeBlanc, originally a co-relator in this action, has been dismissed voluntarily.

After a hearing and careful consideration of this matter, the Court concludes that this action is precluded by the public disclosure bar of the False Claims Act.

## I. *Factual Allegations*

■ Once a defendant raises the issue of a district court's subject matter jurisdiction over a dispute, the plaintiff has the burden of establishing that such jurisdiction exists. *Media Duplication Services v. HDG Software*, 928 F.2d 1228, 1235 (1st Cir.1991). On a motion attacking subject matter jurisdiction, the allegations of the complaint will not be cloaked with a presumption of truth, as they are on a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *Id. See also Espinosa v. DeVasto*, 818 F.Supp. 438, 440 (D.Mass. 1993).

The allegations of LeBlanc's amended complaint [2] are nonetheless essential to a determination of whether there is subject matter jurisdiction under the provisions of the False Claims Act. As will be discussed below, the Court must determine whether LeBlanc based his claims on "allegations or transactions" which had previously been publicly disclosed. If so (and if LeBlanc was not an "original source" as defined by the statute), then this Court may not serve as a forum for this action.

The substance of LeBlanc's amended complaint is as follows.

Raytheon designs, develops, manufactures and sells the Patriot and other military equipment under contracts with the United States and its Department of Defense. The contracts incorporate extensive specifications, standards and guidelines. The government has paid Raytheon billions of dollars under the contracts from the early to mid–1980's to the present to develop, produce, test and sell the Patriot. By mid–1992, the government had ordered about 8,000 Patriots.

Raytheon was required, in every aspect of producing the Patriot, to adhere strictly to all terms of the contracts for the production of the weapon. Extensive requirements applied to design, manufacture, recordkeeping, inspection, testing, quality control, and identification and correction of deficiencies. Various military specifications, including, without limitation, Military Specification MIL–Q–9858A, governed performance of the contract.

LeBlanc alleges that Raytheon failed to comply with many contractual requirements, including MIL–Q–9858A, but nonetheless applied inspection stamps to process sheets and otherwise indicated compliance with applicable specifications. He also alleges that Raytheon fabricated records and statements, thus causing false claims to be presented to, and approved and paid by, the United States.

LeBlanc claims that Raytheon's violation of its contractual obligations resulted in nonconforming Patriots that malfunctioned during the Persian Gulf War. He alleges nearly a dozen specific defects and contends that Patriots were lost, failed to defend against Iraqi Scud missiles, and allowed and caused property damage, injuries and deaths.

LeBlanc alleges, in addition, that during and after the war, Raytheon made false claims and misrepresentations to the government about the effectiveness of the Patriot. He says that Raytheon claimed almost total success against Iraqi missiles in Saudi Arabia, whereas evidence suggests just the opposite: that the system was almost totally ineffective. He says that Raytheon "knew or should have known" that the Patriot did not and could not have performed as well as claimed, and that, in fact, Raytheon has conspired to cover up the Patriot's failures. After making these inflated claims, Raytheon, LeBlanc charges, sold billions of dollars worth of Patriots.

To support his allegations of Raytheon's false claims concerning the Patriot, LeBlanc quotes in his amended complaint public statements from two knowledgeable persons. U.S. Representative John Conyers, Jr., then Chairman of the House Government Opera-

---

2. LeBlanc filed the original complaint under seal on October 20, 1992. He filed his amended complaint, as of right, on July 13, 1993, also under seal. The Court granted LeBlanc's motion to unseal the amended complaint on January 31, 1994. The amended complaint was served on Raytheon on May 27, 1994.

tions Committee and of the Legislation and National Security Subcommittee, is quoted as saying:

> [T]he Patriot's supposedly near-flawless performance may be one of the greatest myths in weapons history ... We know now that the public and the Congress were misled by definitive statements of success issued by ... representatives of Raytheon, the Patriot's prime contractor, during and after the war [and that] only 9 percent of Patriot Scud engagements are supported by the strongest evidence that an engagement resulted in a warhead kill ... [W]e found a pattern of misleading claims and poorly evaluated evidence ... The misinformation supplied by ... Raytheon has given the American people and Congress profoundly mistaken impressions about the Patriot ... [A]ssessments [of Patriot success rates] were performed by people with a vested interest in the program ... [including people] from Raytheon, the Prime Contractor on the program ... [S]oldiers' lives could be unnecessarily endangered ... They may depend on Patriot battalions destroying nine out of ten missiles ... when the actual capabilities are closer to one out of ten, if that.

LeBlanc also quotes Theodore Postol, whom he describes as "an eminent Professor of Science, Technology and National Security at M.I.T.":

> [Records] reveal substantial discrepancies between the claims of high Patriot performance asserted by Stein [a Raytheon executive] and ... video evidence that indicates Patriot was almost a total failure at intercepting Scud warheads during the Gulf War.... [I]nappropriate attempts have

been made to silence the debate over Patriot's Gulf War performance.

## II. *The Law*

### A. *The "Public Disclosure" Jurisdictional Bar*

■ The *qui tam* provision of the False Claims Act, allows a private person to file a civil action, in the name of the United States, against individuals or entities that have violated the substantive provisions of the Act.[3] The current battle focuses on the "public disclosure" jurisdictional bar to such private actions, contained in 31 U.S.C. § 3730(e)(4). The public disclosure jurisdictional bar is framed as follows:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.   (B) For purposes of this paragraph, 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

■ As is readily apparent from LeBlanc's quotation of Representative Conyers and Professor Postol, Raytheon's alleged misrepresentations regarding the effectiveness of the Patriot had already been publicly aired by the time LeBlanc filed his amended complaint.[4]

---

3. *"Qui tam"* is short for *"qui tam pro domino rege quam pro seipso,"* which means "he who as much for the king as for himself." *U.S. ex. rel. S. Prawer and Co. v. Fleet Bank*, 24 F.3d 320, 324 n. 7 (1st Cir.1994). *Qui tam* provisions were first enacted in thirteenth century England as a supplement to ineffective law enforcement. *Id.* The First Circuit, in the *Fleet Bank* case, provides an illuminating history of the *qui tam* provisions of the False Claims Act, including two significant Congressional thrusts and parries following controversial judicial interpretations of the statute. *Id.* at 324–26.

4. The statements of Representative Conyers, in particular, are noteworthy.  He refers to "misleading claims" of, and to "misinformation supplied by," Raytheon—this in an article entitled "The Patriot Myth: Caveat Emptor." *Arms Control Today*, November, 1972.  The article featured an inset, highlighting, under the caption "False Claims," alleged misstatements about the Patriot by Raytheon and the United States government.

But what of disclosure concerning the specific defects of the Patriot? In an attachment to its memorandum in support of its suggestion of lack of jurisdiction, Raytheon has lined up LeBlanc's allegations of Patriot defects against public statements criticizing the Patriot, the government and Raytheon. These statements were either made in a congressional hearing on the performance of the Patriot, in published articles or in a report of the General Accounting Office. The lineup shows that *every* defect and failure of the Patriot alleged by LeBlanc in the amended complaint had been disclosed publicly before the present action was filed.

At the hearing on the suggestion of lack of jurisdiction and motion to dismiss, LeBlanc's counsel conceded that all of the defects of the Patriot alleged in the amended complaint had been previously disclosed publicly. He conceded as well that, before this case was commenced, there had been allegations that Raytheon had exaggerated the Patriot's success. In each instance the concession was ineluctable.

LeBlanc argues, however, that one allegation—that Raytheon had failed to comply with MIL–Q–9858A—had not been previously disclosed, and that his inclusion in the complaint of that claim (considered critical by him to the case for wrongdoing by Raytheon) is sufficient to catapult him over the public disclosure bar. Raytheon, for its part, conceded at the hearing that the specific allegation that Raytheon had failed to comply with MIL–Q–9858A, to its knowledge, had not been publicly made before the amended complaint was filed.

LeBlanc claims to have special knowledge of government contracting procedures and requirements deriving from his previous work at Raytheon and his work with military contracts as a government employee. He argues that this special knowledge gave him the ability to interpret the previously disclosed information about Raytheon's conduct and to conclude that Raytheon must have failed to comply with MIL–Q–9858A. But special expertise is not good enough to get a relator past the jurisdictional bar. "[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation." *U.S. ex. rel. Stinson v. Prudential Ins.*, 944 F.2d 1149, 1160 (3rd Cir.1991).

> [T]here may be situations in which all of the critical elements of fraud have been publicly disclosed, but in a form not accessible to most people, *i.e.*, engineering blueprints on file with a public agency. Expertise in the field of engineering would not in itself give a *qui tam* plaintiff the basis for suit when all the material elements of fraud are publicly available, though not readily comprehensible to nonexperts.

*U.S. ex. rel. Springfield Terminal Railway v. Quinn*, 14 F.3d 645, 655 (D.C.Cir.1994). Le-Blanc has not come forward with previously undisclosed substantive information about Raytheon's alleged duplicity concerning the Patriot. Rather, he has deduced contract violations from his previous experience and from the public allegations which had already been made. MIL–Q–9858A is a publicly available and generally applicable quality assurance requirement, which is, in the apt phrasing of Raytheon's counsel, "an empty vessel." It requires inspections, testing, and other measures to ensure that the substantive specifications of an underlying project are met. MIL–Q–9858A does not impose any specifications particular to the Patriot. Anyone with knowledge of military procurement contracts could conclude, after reading claims that the Patriot had certain defects affecting its performance, that Raytheon had failed to comply with the requirements of MIL–Q–9858A.[5]

Accordingly, the Court concludes under 31 U.S.C. § 3730, that allegations of the making of false claims by Raytheon had been publicly disclosed as of the time of filing of the amended complaint.

B. *"Based Upon"*

LeBlanc advanced an alternative argument in his papers opposing the suggestion of lack

---

**5.** LeBlanc last worked at Raytheon in 1984. None of his work for Raytheon or the government, however, involved disputed aspects of the Patriot.

of jurisdiction and the motion to dismiss. He asserted that, even though he was familiar with publicly disclosed allegations of wrong-doing by Raytheon, he did not base his amended complaint in the present action upon those allegations. Instead, he claims, he used those allegations merely as "points of departure" for a full-scale investigation he conducted. The investigation, it appears, consisted largely of speaking to Professor Postol and assembling documents from Professor Postol's files and from other experts on the Patriot. LeBlanc does not contend that he received any "inside" information from Raytheon dealing specifically with the allegations of false claims made in this case or that he actually saw the confidential Patriot specifications.

At the hearing, LeBlanc appeared to abandon his contention that he did not base his complaint on publicly disclosed information, stressing, as noted earlier, that he had provided something new: his conclusion that Raytheon failed to follow MIL–Q–9858A. Because any concession LeBlanc may have made on this point is at best equivocal, it is appropriate that the Court consider LeBlanc's original contention that this case is not "based upon" public information previously disclosed.

There is a dispute among the circuits as to whether the public disclosure bar applies if the relator did not actually base his action on the publicly disclosed allegations. This Court need not resolve this dispute, for under neither interpretation of the public disclosure bar can LeBlanc prevail.

Again, the statute provides that "[n]o court shall have jurisdiction over an action under this section *based upon* the public disclosure of allegations or transactions...." 31 U.S.C. § 3730(e)(4) (emphasis added). Several circuits have ruled that when the allegation of fraud has been publicly disclosed, the *qui tam* action is barred regardless of where the relator obtained his information, unless the relator himself or herself is the original source of the information. *U.S. ex. rel. Doe. v. John Doe Corp.,* 960 F.2d 318, 324 (2d Cir.1992); *U.S. ex. rel. Precision Co. v. Koch Indus.,* 971 F.2d 548, 552 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1364,

122 L.Ed.2d 742 (1993); *Wang v. FMC Corp.,* 975 F.2d 1412, 1419 (9th Cir.1992); *Houck on behalf of U.S. v. Folding Carton Admin.,* 881 F.2d 494, 504 (7th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990). Explaining this view, the Tenth Circuit has stated that "[a]s a matter of common usage, the phrase 'based upon' is properly understood to mean 'supported by.' In this context, an FCA *qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions." *Koch,* 971 F.2d at 552.

The Fourth Circuit, excepting to the views of the Tenth circuit, responded: "We are unfamiliar with *any* usage, let alone a common one or a dictionary definition, that suggests that 'based upon' can mean 'supported by.'" *U.S. ex. rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1349 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994) (emphasis in original). The Fourth Circuit rejected the notion that an allegation which is publicly disclosed can bar a *qui tam* action where the disclosure does not form the basis for the action. Citing *Webster's Third New International Dictionary,* the court stated that "base upon" means to "use as a basis for." *Id.* at 1348.

> Rather plainly, therefore, a relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based. Such an understanding of the term 'based upon,' apart from giving effect to the language chosen by Congress, is fully consistent with section 3730(e)(4)'s undisputed objective of preventing 'parasitic' actions ... for it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic.

*Id.* (citation omitted).

Judge Wolf of this district has similarly read the "public disclosure" provision as not barring an action if the plaintiff does not actually base the action on the publicly disclosed allegation or transaction. *U.S. ex. rel.*

*LaValley v. First Nat. Bank of Boston*, 707 F.Supp. 1351, 1366–67 (D.Mass.1988). The judge found that the action before him was "based upon the knowledge developed independently by the three original relators. . . ." and allowed the *qui tam* action to proceed, despite the fact that allegations similar to those made by the relators had been previously disclosed to the public. *Id.* at 1367.

In light of the plain meaning of the words "based upon," this Court is inclined to agree with the Fourth Circuit and Judge Wolf. But irrespective of the side of the battle line on which one stands, the public disclosure bar would apply to this action.

If the allegations need only be publicly disclosed in order for the public disclosure bar to apply, then LeBlanc must perforce lose. The Court has already demonstrated that the allegations about Raytheon's conduct with respect to the Patriot had already been publicly revealed.

If LeBlanc had literally to have based his action on the publicly disclosed allegations in order for the public disclosure bar to apply, he would still be out of luck. As noted earlier, he admits to having used the publicly disclosed allegations as "points of departure." What this means is that, but for his review of the publicly disclosed allegations of the Patriot's defects and Raytheon's misinformation, he would not have even known about the possibility of problems with the Patriot or with Raytheon's behavior. In the words of the Fourth Circuit, LeBlanc "actually derived from that disclosure the allegations upon which his *qui tam* action is based." *Siller*, 21 F.3d at 1348.

■ To hold otherwise would distort the meaning of the statute beyond any reasonable bounds. It would allow any individual to learn of publicly disclosed allegations of wrongdoing, then go directly to the source of those allegations, have the allegations repeated and then file an action based on this supposedly new and nonpublicly disclosed information. The public disclosure bar is designed, in part, to prevent parasitic lawsuits—actions in which individuals leech off publicly available information in an· effort to cash in on the generous awards available under the False Claims Act. *See U.S. ex. rel. S. Prawer and Co. v. Fleet Bank*, 24 F.3d 320, 324–26 (1st Cir.1994). LeBlanc's scheme would subvert this objective.[6]

For the foregoing reasons, the Court concludes that it does not have jurisdiction to hear this case, and therefore dismisses the action.[7]

So ordered.

---

6. LeBlanc concedes that he was not an "original source" of the allegations, and he is correct to do so. "Direct and independent knowledge" is a prerequisite for one to qualify as an "original source." 31 U.S.C. § 3730(e)(4)(B). "[W]here one would not have learned of the information but for its public disclosure, one does not have 'direct and independent knowledge' of the information." *Wang v. FMC Corp.*, 975 F.2d 1412, 1417 (9th Cir.1992). *See also Houck on Behalf of U.S. v. Folding Carton Admin. Committee*, 881 F.2d 494, 505 (7th Cir.1989); *U.S. ex. rel. Stinson*

*v. Prudential*, 944 F.2d 1149, 1160 (3rd Cir. 1991).

7. The Court dismisses all of the counts asserted in the amended complaint. LeBlanc's standing flows solely from his status as a *qui tam* plaintiff under 31 U.S.C. § 3730. Because the Court has concluded that the public disclosure bar prevents LeBlanc from proceeding as a *qui tam* plaintiff, all of LeBlanc's claims must be dismissed.