UNITED STATES ex rel. Kevin
Ormond O'KEEFFE,
Plaintiff,

v.

SVERDUP CORPORATION,
et al., Defendants.

No. 98–CV–10433–PBS.

United States District Court,
D. Massachusetts.

Jan. 31, 2001.

Kevin Ormond O'Keeffe, Cohasset, MA, pro se.

Michael F. Hertz, U.S. Department of Justice, Washington, DC, Polly A. Dammann, U.S. Attorney's Office, Civil Division Dept. of Justice, Washington, DC, Frank W. Hunger, Office of Immigration and Litigation, Civil Division, U.S. Department of Justice, Washington, DC, Roberta T. Brown, United States Attorney's Office, Boston, MA, Sondra L. Mills, Department of Justice, Civil Division, Washington, DC, for Kevin Ormond O'Keeffe.

Roberta T. Brown, U.S. Attorney's Office, Boston, MA, for U.S.

Robert E. Hauberg, Jr., Michael T. Dawkins, Tiffanee N. Wade, Baker, Donelson, Bearman & Caldwell, Jackson, MI, for Richard Beumer, Domenic D'Eramo.

Michael J. Lacek, Michael R. Brown, Christian J. Rowley, Palmer & Dodge, Boston, MA, for Lance Neumann.

Edward J. DeAngelo, Attorney General's Office, Boston, MA, Mary M. Logalbo, Assistant General Counsel, MBTA Law Department, Boston, MA, for Patrick J. Moynihan.

Michael J. Lacek, Christian J. Rowley, Palmer & Dodge, Boston, MA, for Sverdrup Corporation, Sverdrup Civil, Inc., Cambridge Systematics, Inc., Massachusetts Bay Transportation Authority.

## MEMORANDUM AND ORDER

SARIS, District Judge.

This is a *qui tam* action brought by *pro se* relator Kevin Ormond O'Keeffe ("Relator" or "O'Keeffe") pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729–33. Relator claims that Sverdup Corporation, Sverdup Civil, Inc., Cambridge Systematics, Inc., and the Massachusetts Bay Transportation Authority (collectively "Defendants") made several misrepresentations regarding the environmental impact of proposed diesel rail commuter service on the Old Colony railroad lines. The United States declined intervention, but filed two amicus briefs. Defendants have moved for summary judgment, claiming: (1) this Court lacks subject matter jurisdiction because Relator's claims are based upon publicly disclosed allegations or transactions; (2) Relator's action is time-barred; (3) the alleged misrepresentations were not contained in a "claim" for payment or approval; and (4) Relator's *qui tam* action is unconstitutional because the government declined to intervene. The Court stayed discovery on the merits pending resolution of these issues.

For the reasons stated below, the Defendants' joint motion for summary judgment is **ALLOWED.**

## I. BACKGROUND

The following facts are undisputed unless otherwise noted:

In 1984, responding to increasing problems with commuter automobile traffic

from southeastern Massachusetts to Boston, the Massachusetts legislature ordered defendant Massachusetts Bay Transportation Authority ("MBTA") to study the possibility of restoring commuter rail service in southeastern Massachusetts. The study's results confirmed the feasibility of implementing a commuter rail transportation system to southeastern Massachusetts. Consequently, the legislature ordered the MBTA to conduct a review of the environmental impacts of restoring commuter rail service via the Old Colony railroad lines. On April 4, 1988 the Urban Mass Transportation Administration ("UMTA"), the Federal Transportation Administrations's ("FTA") predecessor, published a notice in the *Federal Register* indicating its intention to prepare Environmental Impact Statements ("EIS") for the proposed study area.

The MBTA then entered into a contract with defendants Sverdrup Corporation and Sverdrup Civil (collectively "Sverdrup") to provide engineering services for the Project, including assistance in preparing both the Draft and Final Environmental Impact Statements/Reports ("DEIS/R" and "FEIS/R," respectively). Sverdrup then retained subcontractor Cambridge Systematics, Inc. ("CSI") to provide air-quality technical services. Sverdrup and CSI evaluated the Middleborough and Plymouth lines.

UMTA, Sverdrup, CSI, and the MBTA prepared the DEIS/R and FEIS/R as mandated by the § 4332(2)(C) of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321–70e, the NEPA implementing regulations, 40 C.F.R. §§ 1500–1508, and the Massachusetts Environmental Policy Act, Mass. Gen. L. ch. 30, §§ 61, 62–62H. The DEIS/R evaluated transportation alternatives that included the restoration of three lines—the Middleborough, Plymouth and Greenbush lines—for commuter rail service. Following the publication of the DEIS/R, the FTA and the MBTA decided to conduct the Environmental Impact review on the Greenbush line as a project separate from the proposed Middleborough and Plymouth lines.

UMTA and the MBTA approved the DEIS/R on May 7, 1990. Thereafter, a seventy-six day public comment period was held, ending in August, 1990. During the public comment period, almost two thousand comments were submitted at the public hearings, verbally, or in writing to the MBTA, the FTA, or the Massachusetts Environmental Policy Act Unit of the Executive Office of Environmental Affairs. Comments were provided by: federal, state, regional, and local agencies; civic and business organizations; and the public at large. The comments are summarized in chapter 10 of the FEIS/R, entitled "Comments and Responses" and in a supporting document entitled "Summary of the Public Involvement Program." Because of the Project's designation under the Massachusetts Environmental Protection Act, the Massachusetts Office of Environmental Affairs created a Citizens Advisory Committee ("CAC") to assist the agency's review of the EIS documents.

On March 12th and 13th, 1992, the MBTA and the FTA approved the FEIS/R. On June 10, 1992, the FTA issued a Record of Decision ("ROD") finding that the NEPA requirements were satisfied for the Project's Middleborough and Plymouth lines. The FTA subsequently approved capital grants totaling approximately $384,000,000 for allocation to the Project.

Relator, Mr. O'Keeffe, is the co-founder and the president of Technical Resources for Environmental Quality, Inc., a nonprofit charitable organization promoting legal and educational activities in support of the natural environment and citizens' environmental rights. He is a graduate of the Massachusetts Institute of Technology.

Relator asserts that Defendants made several false statements in the FEIS/R and supporting documents concerning the comprehensiveness and results of the

study and the environmental benefits of the Project. In May, 1995, Relator began to question defendant MBTA's overall emissions testing methods and statements regarding the air quality benefits of other project proposals. As a result, Relator obtained Environmental Protection Agency ("EPA") emission factor sets and modeling data for both diesel locomotives and highway passenger vehicles. Using the EPA information and techniques, Relator performed calculations on the MBTA's air quality projections for the proposed Greenbush diesel rail line.

Because Relator's conclusions contradicted the MBTA's assertions, Relator researched the environmental impact claims the MBTA made in its Project EIS documents. In August, 1995 Relator provided state agencies and officials with his self-developed seven page Air Quality Impacts of MBTA Commuter Rail Services Report ("AQI") that assessed air quality impacts of the Project. Relator alone gathered the information for the AQI, by: applying EPA emissions testing methods (which test the same areas studied by defendants, but factor in both the diesel locomotive emissions and the passenger vehicle emissions that would result from the Project); interviewing rail maintenance/fueling personnel at an MBTA/Amtrak facility; and consulting separately with General Motors electro-motive division engineers, a representative of the EPA Fuel and Vehicle Emissions Research laboratory, and a Harvard School of Public Health professor. Relator contends that he bases all of his FCA allegations exclusively upon his review of the defendants' alleged misrepresentations in the EIS documents and upon his subsequent research. The AQI includes calculations and references differing from those presented by Defendants on: diesel locomotive emissions; passenger vehicle emissions; induced highway backfill; impacts of long term exposure to diesel exhaust on local residents; and the actual levels of nitrogen oxide that would result from the Project.

## II. ANALYSIS

### A. Summary Judgment Standard

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)), *cert. denied,* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour,* 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers,* 902 F.2d at 143 (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36.

### B. FCA Jurisdictional Bar

Section 3730(e) of the FCA deprives this Court of jurisdiction over, *inter alia,* a

*qui tam* action "based upon the public disclosure of allegations or transactions ..., unless ... the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). This provision was added as part of the False Claim Amendment Act of 1986. *See* Pub.L. No. 99–562, § 3, 100 Stat. 3153 (1986). The new public disclosure bar supplanted a previous, more restrictive provision that barred a *qui tam* suit "based on evidence the Government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded). While the earlier provision prevented the kind of strictly parasitic *qui tam* action that was the subject of the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), it also created the anomalous situation where an otherwise legitimate relator case was barred when valuable information was shared with the government. *See, e.g., United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100, 1103 (7th Cir.1984) (dismissing action where relator had disclosed original information from its own investigation to the government).

The aspiration of Congress in passing the public disclosure bar of § 3730(e)(4) was to achieve the "golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *United States ex rel. Springfield Terminal Rwy. Co. v. Quinn*, 14 F.3d 645, 649 (D.C.Cir.1994).

**1. Standard for public disclosure bar**

█ The application of the public disclosure bar in this case presents a three prong inquiry. The court must determine whether: "(1) there has been a public disclosure within the meaning of the statute; (2) if so, whether the relator 'based' his suit on the public disclosure; and (3) if so, whether the relator is 'an original source of the information.'" *United States ex rel. LaValley v. First Nat'l Bank of Boston*,

707 F.Supp. 1351, 1366 (D.Mass.1988). At summary judgment, Relator must demonstrate by competent evidence that there exists a disputed issue of fact with regard to each jurisdictional element. Absent such a showing, the Court cannot not presume jurisdiction. *See United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 551 (10th Cir.1992), *cert. denied*, 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993).

**a. "Public disclosure"**

The jurisdictional bar of § 3730(e)(4)(A) applies to the public disclosure of "allegations or transactions" in "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [sic] Accounting Office report, hearing, audit, or investigation, or [in] the news media ...." 31 U.S.C. § 3730(e)(4)(A). The statute's catalogue of sources in which a public disclosure can occur is exhaustive. *See United States ex rel. LeBlanc v. Raytheon Co., Inc.*, 913 F.2d 17, 20 (1st Cir.1990) (Section 3730(e)(4)(A) "does not deny jurisdiction over actions based on disclosures other than those specified"), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991). *See also United States ex rel. Burns v. A.D. Roe Co., Inc.*, 186 F.3d 717, 725 (6th Cir.1999) ("If the information obtained by the relator does not constitute allegations or transactions from one these sources, then the statute did not mean to exclude claims on that basis.").

In this case, the sources of any alleged public disclosure are either comments made in the public EIS proceedings or statements contained in the FEIS/R itself. First, as for the EIS proceedings, any transaction or allegation aired during that proceeding falls within the ambit of § 3730(e)(4)(A). The term "hearing," as it used in § 3730(e)(4)(A), has been interpreted to encompass federal, state, and local administrative proceedings that are open to the public and that receive public comments. *See A–1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1244 (9th

Cir.), *cert. denied,* 529 U.S. 1099, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000); *see also* John T. Boese, *Civil False Claims and Qui Tam Actions,* § 4.02[B][1] at 4–54 (2000) (noting that many courts "have treated the term 'hearing' as synonymous with the term 'proceeding' ").

Second, as for the FEIS/R, because that report was co-authored by the United States Department of Transportation, any transactions or allegations contained therein would also implicate the jurisdictional bar of § 3730(e)(4)(A). *See United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 745 (3rd Cir.1997) (holding that the jurisdictional bar applies to allegations or transactions disclosed in reports that "originate with the federal government.").

### b. "Based upon"

■ Courts have differed over how to determine whether a particular action is "based upon" publicly disclosed transactions or allegations. In one camp, a majority of courts has held that an action is "based upon" a public disclosure when the supporting allegations are similar to or "the *same as* those that have been publicly disclosed ... *regardless of where the relator obtained his information." United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 324 (2d Cir.1992) (emphasis added). *Accord United States ex rel. Mistick PBT v. Housing Auth. of Pittsburgh,* 186 F.3d 376, 386–88 (3rd Cir.1999), *cert. denied,* 529 U.S. 1018, 120 S.Ct. 1418, 146 L.Ed.2d 310 (2000); *United States ex rel. McKenzie v. BellSouth Telecomm., Inc.,* 123 F.3d 935, 940–41 (6th Cir.1997), *cert. denied,* 522 U.S. 1077, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998); *United States ex rel. Biddle v. Bd. of Trustees of Leland Stanford Jr. Univ.,* 161 F.3d 533, 536–40 (9th Cir.1998), *cert. denied,* 526 U.S. 1066, 119 S.Ct. 1457, 143 L.Ed.2d 543 (1999); *Precision Co.,* 971 F.2d at 552 (10th Cir.); *Cooper v. Blue Cross and Blue Shield of Florida, Inc.,* 19 F.3d 562, 566–567 (11th Cir.

1994); *Springfield Terminal Rwy.,* 14 F.3d at 652–655 (D.C.Cir.).

In the other camp, a minority of courts has interpreted "based upon" more narrowly. Those courts have reasoned that the plain language of the statute requires that a barred action must be "derived from" the publicly disclosed allegations or transactions. *See, e.g., United States ex rel. Siller v. Becton Dickinson & Co.,* 21 F.3d 1339, 1348 (4th Cir.) ("Rather plainly ... a relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his *qui tam* action is based."), *cert. denied,* 513 U.S. 928, 115 S.Ct. 316, 130 L.Ed.2d 278 (1994); *United States v. Bank of Farmington,* 166 F.3d 853, 863 (7th Cir.1999) ("a claim which both depends essentially upon publicly disclosed information and is actually derived from such information is 'based upon' a public disclosure for purposes of § 3730(e)(4)(A)."). Thus, according to the minority position, a relator may bring a claim for which the supporting allegations are the very same as those already publicly disclosed, so long as the relator can demonstrate that he had "independent knowledge" of the wrongdoing. *Siller,* 21 F.3d at 1349.

The First Circuit has yet to enter this fray. However, two district courts in this district appear to have adopted the minority position. *See LaValley,* 707 F.Supp. at 1367 (Wolf, J.) (finding jurisdiction where "the information and knowledge upon which [the] action is based did not originate from" the source of public disclosure); *United States ex rel. LeBlanc v. Raytheon Co.,* 874 F.Supp. 35, 41 (D.Mass.) (Lindsay, J.) (noting in dicta, "[i]n light of the plain meaning of the words 'based upon', this Court is inclined to agree with the Fourth Circuit and Judge Wolf."), *aff'd,* 62 F.3d 1411 (1st Cir.1995).

Recognizing that "statutes conferring jurisdiction on federal courts are to be strictly construed, and doubts resolved against federal jurisdiction," *see Precision*

*Co.,* 971 F.2d at 552, I take the majority view because its reading of "based upon" is consonant with the structure and policies of the FCA. The minority's interpretation of the words "based upon" would contravene the congressional policy of prohibiting *qui tam* actions where the government has sufficient information to pursue the false claim itself. *See United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 685 (D.C.Cir.) ("Once the information is in the public domain, there is less need for a financial incentive to spur individuals into exposing fraud."), *cert. denied,* 522 U.S. 865, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997). Indeed, allowing a relator suit after the same allegations or transactions have entered the public domain may have the perverse effect of "either pressur[ing] the government to prosecute cases when it has good reasons not to or reduc[ing] the government's ultimate recovery." *Id.* Moreover, as several courts have pointed out, a literal reading of the statute that places separate emphasis on the words "based upon" would essentially render the public disclosure bar's "original source" exception superfluous. *See Biddle,* 161 F.3d at 538 (reasoning that "original source" exception would be redundant because "to say that a relator's complaint is not derived from public disclosures is to say that the relator had direct and independent knowledge of the fraud.").

■ Thus, where the allegation of fraud or the facts that constitute the essential components of the fraud are publicly disclosed, any *qui tam* action encompassing the supporting allegations is barred unless the relator is the original source.

#### c. "Original source"

■ An "original source" is defined to be "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing [suit]." 31 U.S.C. § 3730(e)(4)(B). This provision has been construed to impose a conjunctive requirement of demonstrating that the relator's knowledge is both direct and independent. *See Springfield Terminal Rwy.,* 14 F.3d at 656. A relator's knowledge is "direct" if she acquired it through her own efforts without an intervening agency, and it is "independent" if her knowledge is not dependent on the public disclosure. *See id.*

The courts have struggled with the status of a relator, such as O'Keeffe, who does not fit the paradigm of the inside whistleblower, but instead is a gadfly outsider. One court has concluded: "[A] person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the Act." *United States ex rel. Barth v. Ridgedale Elec., Inc.,* 44 F.3d 699, 703 (8th Cir.1995) (holding that the union's knowledge of the false nature of the employer's reports was not sufficiently "direct" to give the union "original source" relator standing because the union agent derived his information from visits to the worksite, copies of public payroll records and interviews with employees, but also holding that the inside employee who knew about the fraud was an original source). However, in another case which did not involve traditional insider information, a court held that a relator had independent and direct information when he conducted an investigation and gleaned first hand information about public bus routes "readily available to government investigators." *See United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1017 (7th Cir.1999). However, even the *Lamers* court recognized that there may be a point at which a private investigator "should be termed a busybody and turned away at the courthouse steps." *Id.*

The Court reaches the original source question only if it finds the plaintiff's suit is based on information that has already been publicly disclosed. *See United States ex rel. Barth v. Ridgedale Elec., Inc.,* 44 F.3d 699, 703 (8th Cir.1995),

### 2. Application of standard to Relator's claims

In *Springfield Terminal Rwy.*, the Court of Appeals for the District of Columbia Circuit articulated a helpful and straightforward framework for applying the jurisdictional bar of § 3730(e)(4)(A). According to that framework, "if X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." *Id.* at 654 (emphases omitted). Under the framework, X stands for the allegedly false set of facts set forth in the claim at issue, and Y is a proxy for the allegedly true set of facts. Thus, "when X [the false set of facts] *and* Y [the true set of facts] surface publicly, or when Z is broadcast ..., there is little need for *qui tam* actions," and the claim will be barred unless the relator qualifies as an original source. *Id.* (emphasis in original). "However, where only one element of the fraudulent transaction is in the public domain (e.g., X), the *qui tam* plaintiff may mount a case by coming forward with either the additional elements necessary to state a case of fraud (e.g., Y) or allegations of fraud itself (e.g., Z)." *Id.* at 655.

With this framework as a guide, I will address the false claims alleged in the complaint seriatim.

### a. Alleged false claim 1

*Relator alleges the following:*
The Defendants presented to the United States in Section 5.3.1 (page V–21) of the Project FEIS/R the statement "As shown on Table V–6 total annual emissions from vehicular traffic for each alternative were compared to the No–Build Alternative, The results indicate that all of the build alternatives would decrease emissions of CO, HC, and NOx." This is a false statement pursuant to 31 U.S.C. § 3729(a)(1) because refer-

enced Table V–6 presents zero locomotive emissions.

(Relator's Complaint (Docket No. 1) at ¶ 30).

To back track, the air quality analysis in the DEIS/R and FEIS/R was twofold: (1) a "mesoscale" or area-wide analysis which considered the effects of the project on the overall air quality in the study area, from the South Shore to Boston; and (2) a "microscale" or local analysis which examined air quality in the immediate vicinity of streets, roads, driveways and other facilities effected by the project. Emission rates were "established by sampling and measuring pollutants emitted by vehicles, automobiles, buses and locomotives." (FEIS/R § 5.3.1). The study used the EPA's "Mobile 3 air emissions model" to determine emissions rates. (*Id.*). The FEIS/R stated: "Projected vehicle miles of travel (VMT) in the study area for the year 2000 were applied to the year 2000 emission factors for CO, HC, NOx to derive Old Colony study area pollutant burden." (*Id.*).

Francis Barrett Faulkner II, Senior Project Manager for Sverdrup, defended the methodology used in the study as follows: "We used the phrase 'vehicle miles of travel' as it is commonly used by transportation planners, to refer to travel by highway vehicles. Accordingly, this statement on Page V–21, and the Table V–6 identified in that statement refer only to emissions from miles traveled in automobiles and other highway vehicles and do not refer to diesel emissions from locomotives." (Aff. of Francis Barrett Faulkner II (Docket No. 69), at ¶ 18).

The impact of diesel locomotive exhaust is discussed in the same section of the FEIS/R:

The impact of diesel locomotive exhaust was assessed *only on the study area level* because the primary constituents of diesel exhaust, nitrogen oxides (NOx), and hydrocarbons (HC), do not have a significant effect on air quality until they

have undergone photochemical oxidation in the atmosphere. Atmospheric photochemical oxidation occurs over a period of time at a metropolitan-and-regional scale and cannot be effectively modeled at the local level.

In addition to emitting NOx and HC, diesel engines also emit unburned carbon particles ("soot"), sulfur oxides (SOx), and small amounts of unburned fuel. The vaporized fuel causes the distinctive odor associated with diesel engines. Particulates have a short-term impact on local air quality that is recognized but is not well modeled. The particulates are relatively heavy and are thought to precipitate out of the air after a short time. The significance of low concentrations of these pollutants on public health and the environment has not been well documented. However, it is believed that the impact from diesel emissions from rail is offset by the amount of vehicular emissions reduced at the local level. In terms of improving air quality, each of the build alternatives would reduce automobile traffic, the primary source of pollutant emissions.

The area of greatest concern with regard to the local impacts of diesel exhaust are at layover facilities where the locomotives could represent a stationary source of emissions over a significant time period.

(FEIS/R § 5.3.1) (emphasis added).

Applying the *Springfield Terminal Rwy.* formula to Claim 1, Defendants argue that a public disclosure occurred. While the X (allegedly false state of facts) was disclosed in § 5.3.1 of the FEIS/R, the Y (true state of facts) was supplied by Lorraine Downey ("Downey"), Director of the City of Boston's Environmental Department, who asserted in a written public comment during the EIS process:

The air quality analysis in the DEIS/R is focused on improvements due to re-

duced automobile trips[;] however this may be countered to some extent by increased emissions from the diesel locomotives used on the Old Colony Line. The FEIS/R should compare this trade-off of decreased Expressway car exhaust versus train exhaust to allow reviewers the opportunity to fully understand the impact of these decisions.

(FEIS/R Vol. III, § 10.5, LA–33, p. 2, ¶ 6). These comments were publicly disclosed because they were included as part of the FEIS/R.

■ There is no evidence that Relator derived his claims from Downey's publicly disclosed statements rather than from his own investigation.[1] Unless he qualifies as an original source, however, Relator may not support a *qui tam* claim with allegations that are substantially similar to or the same as those that have been already publicly disclosed. *See Mistick PBT,* 186 F.3d at 387 ("'based upon' means 'supported by' or 'substantially similar to,' so that the relator's independent knowledge of the information is irrelevant.").

In order for a plaintiff to qualify as an original source, Relator must have both direct and independent knowledge of the information supporting the allegations in his complaint. *See Springfield Terminal Rwy.,* 14 F.3d at 656. While Relator's knowledge is arguably "independent" (that is, not derived from the public disclosure), it cannot be regarded as "direct." For a relator's knowledge to be direct, it must be marked by the absence of an intervening agency, instrumentality, or influence. *See Barth,* 44 F.3d at 703. In other words, direct knowledge is mediated only by the plaintiff's own labor. *See United States ex rel. Aflatooni v. Kitsap Physicians Servs.,* 163 F.3d 516, 525 (9th Cir.1999).

The information contained in the AQI, which is the factual basis for Relator's fraud allegations, is the product of

---

1. In his opposition, Relator chose not to address the public comments which defendants argue trigger the jurisdictional bar.

O'Keeffe's interviews with various individuals (including rail maintenance and fueling personnel at an MBTA/Amtrak facility, engineers at General Motors electromotive division, a representative of the EPA Fuel and Vehicle Emissions Research laboratory, and a Harvard School of Public Health professor) and of his analysis of existing data. By Relator's own admission, he would not have been able to discover the alleged fraud without the information obtained in the interviews. Relator's knowledge of the fraud is therefore mediated by the interviewees and constitutes second-hand information at best. *See United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir.1995) ("a person who obtains second-hand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the Act."). In addition, any information supporting a FCA action that Relator gained through his analysis of existing data is also insufficiently direct to make him an original source. Although Relator argues that his particular interdisciplinary expertise and background allow him to understand the significance of publicly disclosed information, that is not enough to qualify him as an original source.[2] *See United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1159 (2nd Cir.1993).

Thus, both the true set of facts (Y) and the allegedly false facts (X) were publicly disclosed within the meaning of § 3730(e)(4)(A). In addition, Relator does not qualify as an original source. Claim 1 of the complaint is therefore jurisdictionally barred.

**2.** Even assuming Relator's knowledge of the information supporting his allegations were both independent and direct, he would still not qualify as an original source. Relator cannot demonstrate, as has been required by some courts, that he disclosed his information to the entity that caused the public disclosure. *See United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2nd Cir.1990);

### b. Alleged false claim 2

Relator alleges the following:

The Defendants presented to the United States in Section 5.3.1 (page V–21) of the Project FEIS/R the statement "The impact of diesel locomotive exhaust was assessed only on the study area level because the primary constituent of diesel exhaust, nitrogen oxides (NOx) and hydrocarbons (HC), do not a significant effect on air quality until they have undergone photochemical oxidation in the atmosphere." There are false statements pursuant to 31 U.S.C. § 3729(a)(1) because:

> a) The impact of diesel exhaust was never assessed on the study area level or at any level whatever.
>
> b) The known and serious local health impacts of sulfur oxides and diesel particulates and [sic] are obfuscated and concealed by the Defendant's false definition of "primary constituents" as being defined by weight only, rather than by known public health impact.

(Complaint at ¶ 31).

With respect to claim 2(a), Relator alleges that the impact of diesel exhaust was never assessed at the study area level at all, despite the claim in the DEIS/R that it was. Defendants again point out that Downey criticized the DEIS/R precisely because the air quality analysis fails to trade off locomotive emissions against car exhaust. While Downey's criticism is not identical to Relator's allegation, it is substantially similar to it and gave the government the heads up that the impact of the diesel exhaust had not been investigated at either the local or study area level. *See*

*Wang v. FMC Corp.*, 975 F.2d 1412, 1418 (9th Cir.1992). In the alternative, Relator cannot demonstrate, as other courts have required, that he provided his information to the government *before* any public disclosure occurred. *See Findley*, 105 F.3d at 690 (D.C.Cir.); *McKenzie*, 123 F.3d at 942 (6th Cir.).

*Mistick PBT*, 186 F.3d at 387 ("'based upon' means 'supported by' or 'substantially similar to'").

■ With respect to claim 2(b), plaintiff alleges that the defendants have "obfuscated and concealed" the "known" public health effects of diesel emissions by designating nitrogen oxides and hydrocarbons as the "primary constituents" of diesel emissions because of the weight of the constituents, rather than their known health effects. Here, however, the primary constituents subject to analysis (Y) were publicly disclosed. While the contours of this claim are unclear, Relator apparently disputes the criteria used for the selection of these constituents. Plaintiff's unique expertise which permits him to understand the significance of publicly disclosed statements does not give him relator status.

> [T]here may be situations in which all of the critical elements of fraud have been publicly disclosed, but in a form not accessible to most people i.e., engineering blueprints on file with a public agency. Expertise in the field of engineering would not itself give a *qui tam* plaintiff the basis for suit when all the material elements of fraud are publicly available, although not readily comprehensible to non-experts.

*Springfield Terminal Rwy.*, 14 F.3d at 655.

Thus, there was a public disclosure within the meaning of the FCA. In addition, for the reasons already stated, Relator does not qualify as an original source. Claim 2 is therefore jurisdictionally barred.

#### c. Alleged false claim 3

Relator alleges the following:

The Defendants presented to the United States in Section 5.3.1 (page V–21) of the Project FEIS/R the statement "Particulates have the short-term impact on local air quality that is recognized but is not well modeled." This is a false statement pursuant to 31 U.S.C. § 3729(a)(1) because:

a) Particulate emissions for diesel locomotives were published by the U.S. Environmental Protection Agency with all other category pollutants, allowing a simple comparative "modeling" to alternatives;

b) Diesel respirable particulates can remain suspended in the air for days;

c) Short-term impacts become long-term impacts with repetitive exposures inherent to diesel commuter-rail operations.

(Complaint at ¶ 32).

The Y in this instance was previously provided by Paul Reavis ("Reavis"), a Boston Redevelopment Authority official. Specifically, in the Local Agency comments section of the FEIS/R, Reavis criticized the defendants' DEIS/R evaluation of particulates:

> The DEIR presents only some unsupported assumptions that there would be little or no impacts on local air quality from particulate emissions. The lack of any analysis based on the mere assumption that short-term particulate impact is not well documented is not satisfactory. Because of concerns that have been raised by some of the residents along the proposed Old Colony route, we feel that the Final EIR should undertake more thorough research into the effects of particulate concentrations and present a much more detailed analysis of the potential local air quality impacts of the diesel operations.

(FEIS/R Vol. III, § 10.5, LA–25, p. 3 ¶ 7). The accusation by Reavis that particulates were not modeled thoroughly enough and that Defendants' justification for doing so was invalid are the same or substantially similar to allegations of fraud in Relator's complaint. Since the allegedly false state of facts (X) was also publicly disclosed in the FEIS, the essential elements of the fraud entered the public domain. Moreover, to the extent that relator's scientific expertise permits him to disagree with a statement

in the FEIS (i.e., the availability of an EPA model), he is not an original source under the case law. Claim 3 is therefore barred by operation of § 3730(e)(4)(A).

### d. Alleged false claim 4

Relator alleges the following:

The Defendants presented to the United States in Section 5.3.1 (page V–21) of the Project FEIS/R the statement "The area of greatest concern with regard to local impacts of diesel exhaust are at layover facilities where the locomotives could represent a stationary source of emissions over a significant time period." This is a false statement pursuant to 31 U.S.C. § 3729(a)(1) because the statement is used by the Defendants to obfuscate and conceal the equal or greater impact of diesel exhaust at the urban convergences of rail lines, where people are exposed to rail emissions equal to literally thousands of daily pass-bys by diesel buses or trucks, and often concurrently exposed to those emissions.

(Complaint at ¶ 33).

The Defendants argue that the true state of affairs (Y), that a different location was the area of greatest concern for exposure to diesel exhaust, was previously injected into the public domain by Robert S. Cummings, an engineer who prepared a report on the Project for the City of Quincy. Subsequent to reviewing the DEIS/R, he stated:

We would concur that on the surface a net benefit to the overall air quality in Quincy could be realized. However, specific impacts associated with the increased air emissions resulting from increased rail traffic along the project corridor should be discussed. While the "mesoscale" analysis may show a net benefit, a true "microscale" analysis will most likely show an adverse impact to those areas immediately adjacent to the corridor.

(FEIS/R Vol. III, § 10.5, LA–9, ¶ 10).

Because the statement was published in the FEIS/R, it qualifies as a public disclosure. As Defendants point out, the project corridors include these so-called "urban convergences" where railway lines and automobile roadways run parallel or converge. This statement therefore publicly flags the allegation that the study obfuscated the impact of diesel exhaust at urban convergences, which are included in the project corridor. Since the essential elements of the alleged fraud were publicly disclosed and Relator cannot be considered an original source, this claim cannot survive the jurisdictional bar.

### e. Alleged false claim 5

Relator alleges the following:

The Defendants presented to the United States in Section 5.3.1 (page V–22) of the Project FEIS/R 'Table V–6 Air Quality Mesoscale Analysis (Year 2000).' This Table and Analysis constitute false statements pursuant to 31 U.S.C. § 3729(a)(1) because:

a) The analysis presented omits the air emissions of the Project proposal (diesel locomotives);

b) The analysis, by a variety of deliberate methods, massively overstates the emissions of passenger vehicles diverted;

c) Passenger vehicle diversions are falsely assumed to be permanent.

(Complaint at ¶ 34).

In the extensive commentary responding to the DEIS/R, the EPA (FEIS/R Vol. III, § 10.2, FA–8, pp. 1–2, ¶ 2), the Town of Middleborough's Planning Board (*Id.* at § 10.5, LA–3, p. 3, ¶ 12), the Town of Braintree (*Id.* at § 10.5, LA–19, p. 5, ¶ 22), and the Chairman of the Office of the Planning Board for the Town of Braintree (*Id.* at § 10.5, LA–22, p. 2, ¶ 5) raised similar concerns to those Relator alleges in claim 5. Several of these criticisms specifically focused on the possibility that new automobile commuters would negate the benefit of the project by filling the vacancies created by the commuters using the

new train alternative. These comments, all of which were published in the FEIS/R, constitute a public disclosure of the alleged true set facts (Y). Because the alleged false state of facts (X) was also publicly disclosed in the FEIS/R and Relator is not an original source, claim 5 is jurisdictionally barred.

### f. Alleged false claim 6

Relator alleges the following:

The Defendants presented to the United States in Section 10.8 (LA–33) of the Project FEIS/R a response to comments by the City of Boston Environmental Department requesting analysis of local impacts of diesel exhaust, as follows: "The overall air quality improvements related to the commuter rail alternatives as described in 5.3.1(a) 'Study Area Impacts' under Section 5.3.1 'Air Quality' of Chapter V 'Environmental Consequences,' incorporate both the reduction in automobile emissions in the study area and the increase in locomotive emissions in the study area." This is a false statement pursuant to 31 U.S.C. § 3729(a)(1).

(Complaint at ¶ 35).

This claim concerns Defendants' response to commentators' criticism that the DEIS/R fail to account for the environmental impact of increased diesel emissions resulting from the proposed commuter rail service.[3] In that sense, Relator's claim 6 is basically derivative of claim 1. As stated above, Relator's claim 1 is jurisdictionally barred because its essential elements were publicly disclosed through Downey's public criticism of the methods used in the DEIS/R. The only new element provided in claim 6 is Defendants' response to that criticism. That response, even if knowingly false, adds nothing to the jurisdictional analysis since both the allegedly true state of facts and the false state of facts were already publicly disclosed within the meaning of § 3730(e)(4)(A).

### g. Alleged false claim 7

Relator alleges the following:

Under a cover letter dated June 12, 1992, (two days after the issuance of the FTA R.O.D.) the MBTA provided to the Project FEIS/R Distribution list a "Memorandum to: Files" on Cambridge Systematics, Inc. letterhead dated June 4, 1992, from Robert Lepore of Cambridge Systematics and designated "Re: MBTA Old Colony Railroad Rehabilitation Project, AA/FEIS Report, Supplemental Air Quality Impacts." The MBTA cover letter states: "The Environmental Protection Agency has found that this reevaluation satisfies their requirements for a carbon monoxide microscale analysis. There are no exceedances of any of the National Ambient Air Quality Standards for carbon monoxide indicated by the analysis." The Cambridge Systematics, Inc. analysis states that "Table 3 summarizes the train pass-by impacts of Train Pass–By on CO Concentration at the Union St. Grade Crossing (Comparison of Mobile 3 and Mobile 4.1 Results)." This document is a false statement to the United

---

**3.** To refute the argument that there was no area study of locomotive emissions, defendants point to the "Analysis of Traffic, Air Quality, Noise and Vibration Impacts in Dorchester" (Appendix IX) which compares the "magnitude of additional pollutants that are generated by locomotives in Dorchester, with the reduction in pollutants resulting from reduced automobile traffic." (*Id.*, Table 3–4). A similar study was done for Quincy. The Dorchester study was prepared pursuant to a 1988 directive of the legislature and was publicly discussed at a CAC meeting. (Faulkner Aff. at ¶¶ 13–14). Relator objects to a reference to this Dorchester study on two grounds. First, he contends that this document was never listed in the table of contents of the DEIS/R or FEIS/R or submitted to the CAC. However, this study was referenced in the FEIS/R (FEIS/R § 5.3.1(a), p. V–21). Second, he argues that the analysis presented is "massively defective." However, this allegation is not in the complaint and an allegation of "defective," without more, will not support a claim under the FCA.

States pursuant to 31 U.S.C. § 3729(a)(1), which transparently purports to model train pass-by emissions but presents no such emissions whatever.

(Complaint at ¶ 36).

 Relator argues that Defendants misrepresented Table 3 by calling it a "train pass-by" table even though the table does not include locomotive emissions. Defendants submit affidavits that the term "train pass-by" is a term of art that means the amount of emissions produced by vehicles as they wait for a train to "pass by." Robert A. Lepore, who was a Vice President of CSI, and was personally involved in preparing the memorandum, states that Table 3 does not contain any discussion of train or locomotive emissions and that the purpose of the table and EPA models cited (Model 3 and 4.1) was to summarize the effect of CO concentration resulting from queuing automobile traffic while the train passes it at the Union Street grade crossing.

This claim stands in a different posture because there was no public disclosure of the alleged true state of facts (Y) or the alleged fraud (Z) during the public comment period. Nonetheless, Relator has presented no evidence pursuant to Fed. R.Civ.P. 56(f) justifying discovery on this assertion of the purpose of Table 3. He has produced no evidence to rebut the assertion that the term "train pass-by" is accepted to mean the automotive emissions generated while cars wait for trains to pass. Rather, he argues that the only possible technical result of an additional study undertaken to present CO emissions of automobiles using a newer Mobile 4 emissions model would be to further lower the Mobile 3 study results for automobile CO, which had already been demonstrated to be entirely low enough. Relator argues further that the train pass-by impacts

study, if not intended to show local train emissions, therefore would have been a total exercise in futility.

The allegation that the new study was pointless or redundant because it did not study locomotive air emissions does not support a claim under the FCA. Relator has not alleged a crucial element of his claim, which is that the statement by Defendants was in fact false.[4] Defendants' are therefore entitled to summary judgment on claim 7 of Relator's complaint.

### E. Other issues

Given the outcome of the jurisdictional issue, the Court need not reach the additional bases for summary judgment argued by Defendants.

---

4. In fairness to Relator, this claim has been addressed on the merits rather than on the limited issues which the Court ordered briefed. However, both sides fully addressed the merits of this claim in their papers, and Relator has not demonstrated that any discovery will shed further light on this problem which appears to be rooted in semantics.